UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

D.H. and A.H., individually and on behalf of H.H.,

Plaintiffs-Appellants,

-against-

New York City Department of Education,

Defendant-Appellee.

**COMPLAINT
24-CIV-4575**

---

Plaintiffs D.H. and A.H., individually and on behalf of their son, H.H., by their attorneys,

Regina Skyer & Associates, L.L.P., as and for their Complaint allege and state the following:

**PRELIMINARY STATEMENT**

1.      Plaintiffs D.H. and A.H., on behalf of their child, H.H., bring this action pursuant to

Section 1415(i)(2) of the Individuals with Disabilities Education Improvement Act ("IDEA"), as

amended (20 U.S.C. § 1400 *et seq.*), the pertinent implementing regulations promulgated under

the Code of Federal Regulations, Article 89 of the New York State Education Law, and Part 200

of the Commissioner's Regulations against the New York City Department of Education

("District" or "DOE"), seeking review and reversal of the State Review Officer's ("SRO")

decision dated February 20, 2024.  (Exhibit *1[1])

2.      H.H. is a sweet, friendly, and happy 6-year-old child who has been classified by the

DOE as eligible for special education services as a student with Autism (Ex. 1-1, Ex. 4-2). Since

July of 2022, H.H. has been placed at the Shirley Aninias School ("SAS"), a 12-month early

---

[1] Consistent with the usage below, exhibits preceded by an alphabetic reference were exhibits
introduced by H.H.'s parents at the IHO hearing.  Numerical exhibits were introduced by the
DOE.  Citations beginning with "Tr." indicate pages within the transcript of the hearing before
the IHO.  Starred exhibits have been attached to this Complaint.

childhood and elementary school program for students who have developmental delays, complex

learning needs, and communication deficits with attendant social/emotional challenges (Ex. Q-

1). SAS provides a full academic curriculum, including, Applied Behavior Analysis ("ABA")

supports, along with on-site related services, including speech/language therapy, occupational

therapy ("OT"), physical therapy ("PT") and counseling (*Id.*).

3.      H.H. displayed early developmental delays in the domain of speech acquisition as

well as delays in both fine and gross motor skills. He was provided with Early Intervention

services and received 20 hours per week of ABA therapy (Ex. C-2). H.H. then attended a private

mainstream pre-school with a Special Education Itinerant Teacher ("SEIT"). He was eventually

able to adjust to this program *only* if his SEIT was present to provide him with prompts,

redirection, and constant support (Ex. C-2).[2] Based on an Individualized Education Program

("IEP") that was developed by the DOE's Committee on Preschool Education ("CPSE") on

August 25, 2021, H.H. was provided with 12.5 hours per week of SEIT services. This part-time

level of services was, however, deemed to be an insufficient number of hours to meet his needs,

which resulted in a determination by a prior Impartial Hearing Officer ("IHO") that the DOE had

deprived H.H. of a FAPE for the 2021-2022 school year. Moreover, the prior IHO explicitly

found that because the DOE's provider suddenly ceased providing any services at all, the DOE's

resulting inaction left a limited range of options available to the family. H.H. was, in fact, left

---

[2] The SEIT "Turning 5" report prepared by the special education teacher on December 7, 2022 explicitly confirmed that H.H. required 1:1 instructional support in order to learn. The DOE omitted and withheld this report from the documents it submitted as evidence at the Impartial Hearing.

without any SEIT provider and no serviceable program as of July 1, 2022, and as a result, the family was compelled to investigate other available educational programs. The DOE did not appeal the findings and determinations of this 2021-2022 IHO decision, which, therefore, became final and binding.

4.      At issue is the appropriateness of a subsequent IEP that was developed by the DOE's Committee on Special Education ("CSE") for the 2022-2023 school year. This IEP was developed without consideration of H.H.'s need for consistent 1:1 support, which was previously demonstrated in the prior Impartial Hearing. The CSE's failure to recognize this need, which was documented in all of H.H.'s reports and evaluations, resulted in an inappropriate program offer of a 6:1+1 classroom placement without sufficient information, data or evidence to support such a recommendation. The Parents registered timely objections to this IEP (Ex. A, Ex. B).

5.      On October 19, 2023, an Impartial Hearing was conducted. This hearing lasted only 75-minutes and the DOE presented no witnesses and no testimony to describe the IEP process or to explain and justify the terms of the IEP. Additionally, the DOE was permitted to enter documents into the record that had not been properly disclosed to the Parents. Moreover, the documents that were submitted by the DOE revealed that the CSE, in developing the IEP, did not consider H.H.'s most recent independent neuropsychological evaluation (Ex. 2-2). Significantly, the DOE also neglected to submit any teacher progress reports into evidence, leaving a fundamental void in the ability of a reviewing tribunal to critically assess information that was essential to determine whether the IEP and program recommendation were appropriate. Nonetheless, IHO Eryn Defontes determined that the DOE had provided H.H. with a free appropriate public education ("FAPE") and denied the Parents' request for reimbursement of the tuition and related costs.

6.     The Parents timely appealed the IHO's decision.  The gravamen of the appeal was the appropriateness of the DOE's proposed program and placement and the DOE's failure to have sustained its burden of proof to justify the IEP and program recommendation.  The SRO, based solely on the improperly admitted documentary evidence, upheld the IHO's Findings of Fact and dismissed the Parents' appeal.

7.     Through this action, Plaintiffs seek a determination that:

   a. The DOE failed to provide H.H. with a FAPE for the 2022-2023 school year;

   b. H.H.'s placement at the Shirley Aninias School where he was provided with 1:1 instruction and the related services of speech and language therapy, occupational therapy, and physical therapy, consistent with all previous evaluations and professional input, was an appropriate placement for H.H.,

   c. The equities favor H.H. and thus require that the DOE reimburse H.H.'s parents for tuition costs, transportation costs and all related expenses incurred to educate H.H.; and

   d. That H.H. is entitled to any other further relief as may be just and proper under the circumstances.

## JURISDICTION

8.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and 20 U.S.C. § 1415(i)(2)(A) and (3)(A).  This Court has supplemental jurisdiction over any state law claims

herein asserted pursuant to 28 U.S.C. § 1367, as such state law claims form part of the same case or controversy as the claims for which this Court has original jurisdiction.

9.      Venue is proper under 28 U.S.C § 1391(b) because the parties reside in this judicial district.

10.     If successful, Plaintiffs are entitled to costs and attorneys' fees under 42 U.S.C. § 1988(b) and 20 U.S.C. § 1415(i)(3)(B) *et seq.*

## PARTIES

11.     Initials are used throughout this Complaint to preserve the privacy and confidentiality of the child, H.H., and the family, consistent with the privacy provisions promulgated under section 1417(c) of the IDEA, and the Family Education and Privacy Rights Act, 20 U.S.C. § 1232(g).

12.     Plaintiffs D.H. and A.H. are the parents of H.H.  They reside in New York, New York.

13.     Defendant DOE is a corporate body, created by Article 52 of the New York State Education Law, CLS Educ. Law § 2550 *et seq.*, that manages and controls the public school system of the City of New York.  Upon information and belief, the DOE receives funding pursuant to the IDEA, and therefore must comply with that statute's provisions, including providing a FAPE to all students with educationally handicapping conditions, including H.H., who reside within New York City.  *See* 20 U.S.C. § 1412.  The DOE's principal place of business is 52 Chambers Street, New York, New York 10007.

## FACTUAL ALLEGATIONS

### H.H.'s Disability and Its Educational Impact

14.     H.H. has been known to the DOE as a student with intensive needs and marked deficits in all areas of educational and adaptive functioning. He presents with delays in cognitive skills;

expressive and receptive language; gross and fine motor development; executive functioning competency; social and emotional skills; and self-help abilities.  H.H. is resistant to new and less preferred activities; he has restricted interests; he exhibits rigidity and low motivation; he displays sensory reactivity, including motor stereotypies; he has engaged in elopement, screaming, hitting, and non-compliant, maladaptive and impulsive behaviors; he has challenges with peer interaction and reciprocity; and he becomes easily distracted and struggles with transitions, displaying difficulties with following routines and directions especially when many people are around (Ex. C-3, C-9, C-10, C-11, Ex. H-2, H-6, Ex. I-5, I-7, Ex. S-7).

15.     In February of 2022, the Parents had H.H. undergo a comprehensive independent neuropsychological evaluation (Ex C). The neuropsychologist, Dr. Matthew Pagirsky, consulted with H.H.'s SEIT and learned that he required support for sitting, attending, responding and following instructions as well as 1:1 support to shift him away from impulsive, dysregulated, and self-directed behaviors (Ex. C-1). H.H. also presented with delays in emerging executive functioning skills and in areas of inhibitory control, working memory and cognitive flexibility (Ex. C-10). The evaluation noted that H.H. is self-directed and that he manifests sensory dysregulation especially with loud noises; that he engages in hand-flapping, toe-walking, echolalia, and repetitive sounds, motions and behaviors, especially when he is over-stimulated; that he displays gravitational insecurity; and that he struggles with transitions, particularly when directed to move from a preferred activity to a non-preferred activity (Ex. C-3, C-4, C-5, C-6, C-9). During the evaluation, H.H. did not respond to his name, he had difficulty engaging with joint attention, and body tensing was also observed (Ex. C-4). H.H. also displayed challenges with focusing and his language functioning, motor functioning, attention, and executive functioning skills were all noted to be 2 to 3 years delayed (Ex. C-6, C-7).

16.    In terms of adaptive functioning and activities of daily living, H.H. required support for feeding himself with utensils; he was not yet fully toilet trained; he was unable to communicate when he needed to be changed; and he required support when he needed changing, to take off and put on clothing (Ex. C-8).

17.    With respect to social and emotional functioning, the evaluation reported that "many people talking around him" can be "distressing" for H.H.; that "he seems to be in his own world" and that he experiences clinically elevated hyperactivity and impulsivity (Ex. C-9, C-11). Additionally, H.H.'s motor delays adversely impacted his ability to complete daily tasks (Ex. C-10). Dr. Pagirsky concluded that H.H. not only had social difficulties, even with supports in place, but also, that his interactions were limited due to his narrow special interests, his ritualized behavior patterns, his reactivity to sensory input, his repetitive motor movements, and his inflexibility of behavior (Ex. C-11).

**The Individualized Education Program Meetings**

18.    On April 1, 2022, the CSE convened to develop an IEP for H.H. to commence in September of the 2022-2023 school year (Ex. 1-1, 1-25, Ex. 2-3). The IEP reflected H.H.'s global delays and pre-kindergarten functional levels (Ex. 1-15) and noted, at virtually every turn, that only when H.H. has 1:1 adult support, can he be functional at school and endeavor to attend to educational tasks. The IEP also reflected that he engages in self-stimulatory behavior without such 1:1 support (Ex.1-1). For example, the IEP specifically noted that H.H. best sustained attention and engaged in functional play with adult support (Ex. 1-2), described in all of the evaluations as *1:1 support*, which is the only level of support H.H. has ever experienced, and which 1:1 support has been documented to be necessary and to inform his progress. The IEP similarly noted that H.H. was slowly developing skills in understanding common objects, such as

toys, food, animals etc., however, his progress in this regard was directly attributable to the "*one on one teaching scen*arios that support his ability to attend and with the use of modeling and prompting" (Ex. 1-2; emphasis added). Equally telling is the IEP's acknowledgement that H.H. "has made progress with attending stories *one-on-one* with familiar books and in a group" and that he is "more tolerant of the teacher holding the book and turning the page in "*a one-on-one context*" (Ex. 1-3; emphasis added).

19.     With respect to peer interaction, H.H., according to the IEP, was learning to pass toys to a peer with "adult support providing gestures and partial physical prompting" (Ex. 1-4). The process of acquiring this skill, like all others noted in the IEP, was developed through 1:1 instructional or therapeutic support (Ex. 1-4, 1-6, 1-8). In fact, the IEP explicitly noted that H.H. "also has shown improvement with his ability to understand and follow single step instructions *in one-on-one teaching scenarios* during routines and play (Ex. 1-7; emphasis added). Significantly, nowhere in the IEP, and nowhere in the DOE's documentation, is there any support upon which to base a finding that H.H. would be able to accomplish these tasks or make educational progress, and not regress, in a 6:1+1 placement.[3] Indeed, even in the management needs section of the IEP, 1:1 adult support is not ever mentioned (Ex. 1-10). The CSE justified this lack of 1:1

---

[3] Each item of documentation submitted by the DOE establishes that H.H. required 1:1 adult support in order to make educational progress. None of these documents evidence or even remotely suggest that H.H. could make progress in a 6:1+1 setting. Specifically, the Social History Update (Ex. 4) indicated that H.H. was happy about going to his mainstream pre-school, in which he had full-time 1:1 support (Ex. SRO-A). The PT progress report (Ex. 5) indicated that H.H. inconsistently follows simple, single-step commands and that he requires full and "constant assistance, supervision and cuing to remain on task" (Ex. 5-1). The Speech Therapy Progress Report (Ex. 6) describes communication skills that were being developed in a 1:1 therapeutic setting and the OT therapy Turning 5 Report (Ex. 7) likewise noted that H.H. had been receiving OT services in a one-on-one setting at a sensory gym and that he responded "positively" to engagement in a 1:1 modality (Ex. 7-1). Not one of the documents submitted by the DOE as evidence even refers to H.H.'s ability to learn or make progress in the setting recommended by the CSE.

support by advising the Parents that it was "capped" at the 6:1+1 recommendation (Ex. A-2, Ex. K-4), thereby conceding a pre-determined result.

20.   The goals delineated in the IEP were also deficient. Goals were created for related services (Ex. 1-12 - 1-19), but no instructional or academic goals were developed.

21.   Additionally, approximately 43 periods of instruction and pull-out related services were mandated on the IEP (Ex. 1-20), but there are, at most, 40 periods in a given school week, including 5 periods of lunch, therefore an explanation was warranted from the DOE as to how this IEP could possibly be implemented, as written.

22.   The IEP also mandated that H.H. receive specialized transportation services (Ex. 1-24, 1-26), but no transportation services were provided by the DOE (Ex. K-8).

**DOE Designation of P.S. 33**

23.   A Prior Written Notice dated June 15, 2022 was prepared by the DOE advising the Parents that the DOE was recommending that H.H. be placed in a 6:1+1 specialized program at P.S. 33, commencing in September of 2022, where he would also receive his related services (Ex. 3).[4] Two days later, on June 17, 2022, the Parents provided the District with notice outlining the deficiencies in the IEP and alerting the DOE that unless these deficiencies were addressed and remedied, the Parents intended to place their child at SAS, formerly known as Ready Set Play, for the 12-month 2022-2023 school year (Ex. B). On July 11, 2022, the Parents signed an enrollment contract with SAS (Ex. E). This contract permitted the Parents to withdraw H.H. from SAS prior to September 8, 2022, with liability limited to the non-refundable deposit (Ex. E-4).

---

[4] Although the Parents attempted to arrange a school visit, the DOE never finalized a date for a visit (Ex. K-5).

24.    The DOE did not respond to the Parents' notice, nor did it offer any provider to comply

with the SEIT summer services mandated in H.H.'s 2021-2022 IEP. Given their limited options,

the Parents placed H.H. at SAS as of July 2022 in order that he have access to a full-time special

education program, which utilized the services of a 1:1 special education teacher, as was found

by the prior IHO to have been necessary to provide him with a FAPE. The SAS placement was

necessary to maintain the same program that H.H. had been placed in by the CPSE because no

other summer placement was offered by the DOE.

**Proceedings Before the Impartial Hearing Officer**

25.    A Pre-Hearing Conference was scheduled for September 20, 2023, to discuss the matter,

identify the issues and determine the extent to which the DOE would be disputing the allegations

contained in the Parents' Due Process Complaint. The DOE failed to attend this Pre-Hearing

Conference despite having selected the date and having been notified during the course of the

Pre-Hearing Conference that the DOE's attendance was required.

26.    On September 20, 2023, IHO Defontes issued a pretrial Hearing Guidelines and Order

that reiterated the requirement that five business days before the hearing both parties were

required to disclose all documents sought to be entered into the evidentiary record. The Hearing

Guidelines and Order also required that any objections to any portion of the opposing party's

five-day disclosure must be made three business days prior to the hearing. Although the DOE

was directed to review the Order and confirm receipt, the DOE failed to respond. This pattern of

non-compliance and non-responsiveness on the part of the DOE pervaded the proceedings.

Indeed, despite reminders by the IHO regarding the need to appear and "be mindful of [the]

disclosure date," the DOE persistently failed to respond. The Parents complied with the IHO's

instructions and on October 13, 2023, five-days before the hearing was to commence, Parents'

counsel informed the IHO that the DOE had not disclosed any documents or a witness list.

27.     The DOE eventually disclosed documents on October 13, 2023, after the close of

business. The DOE disclosed only the Student's April 1, 2022 IEP, two Prior Written Notices

(dated 5/18/22 and 6/15/2022), a Social History Report dated 3/11/2022, a Physical Therapy

Progress Report dated 12/15/2021, a Speech Therapy Progress Report dated 7/12/2021, and an

Occupational Therapy Progress Report dated 12/17/2021. Notably, the DOE did not disclose the

Teacher ("SEIT") Report, dated December 7, 2021, which the Prior Written Notice explicitly

listed as a document that was relied on by the CSE, nor did the DOE disclose any other

evaluation of the Student. *Cf.* Ex. 2-2 with Disclosure. It is also significant that the Prior Written

Notice did not list H.H.'s February 2022 independent neuropsychological evaluation as a

document that the CSE considered (Ex. 2-2) and there is no specific indication in the IEP that it

was ever considered.

28.     At the Impartial Hearing, the IHO sought an explanation from the DOE's representative

addressing "why these documents are relevant and how they may rebut or contradict [the

Parents' case] or support the District's position." (Tr. 19). The DOE replied by restating the

terms of the IEP and concluding that the recommendation made under this IEP "would be

appropriate for the student… and would provide the appropriate supports to allow the student to

make sufficient progress." (Tr. 20). This unsubstantiated and conclusory assertion by an attorney,

in the course of litigation, is the only purported "explanation" provided by the DOE about the

appropriateness of the program recommended for H.H. given the DOE's failure to present any

witnesses or any testimony of any kind.

29.     The Parents objected to the documents being entered into the record, as the DOE failed to comply with the five-day disclosure requirement. (Tr. 22-27). The IHO overruled this objection, allowed the documents in, but then inconsistently applied the rules and stated that "strict timelines with which to notify myself and opposing counsel of an intent to cross-examine [witnesses]" would be enforced as per the same Hearing Guidelines and Order that contained the requirement to disclose documents five business days prior to the hearing (Tr. 30). The Parents had complied with governing regulations and with the IHO's pre-hearing rules. The IHO's decision to exempt or excuse the DOE from abiding by five-day disclosure requirements, in circumstances in which the DOE failed to present any testimonial evidence consistent with its burden of proof, operated to deny the Parents' their due process rights as promulgated in the Commissioner's regulations (*see* 8 NYCRR 200.5(j)(3)(xi), (xii)(a)). The IHO's inconsistent application of the rules inured to the detriment of the Parents and operated to eviscerate New York State statutory requirements imposing the burden of proving a FAPE on the District (*see* New York Education Law § 4404[1][c])

30.     The DOE presented no opening statement (Tr. 31) and presented no testimony or evidence to provide any clear or cogent response to the allegations contained in the Due Process Complaint.

31.     While the IHO recognized that the DOE bore the burden of proof to establish the appropriateness of the IEP and placement recommendation (IHO Dec. 4), the IHO did not hold the District to its burden. In fact, the IHO unfairly allowed the DOE to violate the rules of disclosure (*see* 8 NYCRR 200.5[j][3][[xii]) and place documents in the record, without any elaboration, to the detriment and prejudice of the Parents (Tr. 22-23).

32.     It was incumbent upon the DOE to establish and explain, *inter alia*, what the 6:1+1

program encompassed and how it could meet H.H.'s individualized needs. The DOE was

required to amplify and reveal what the IEP intended in terms of whether individualized support,

if any, would be provided to H.H. in order to enable him to make meaningful progress,

particularly in light of the progress reports that demonstrated his need to have 1:1 adult support

at all times. The DOE presented no evidence whatsoever to explain how the terms of the IEP

were reached insofar as H.H.'s needs are concerned.

33.     The IEP specifically referenced that H.H.'s progress was dependent on the availability of

his 1:1 SEIT or 1:1 related service provider, yet neither the IEP, nor any of the other documents

submitted by the DOE, addressed how, or even whether, H.H. would be able to function with

five other students in his classroom, without the immediate presence and constant assistance of

1:1 instructional support via a SEIT or SETSS provider. Moreover, there was no opportunity for

the Parents to question any DOE witnesses as to how the CSE arrived at its determination, an

issue upon which the DOE bore the burden of proof, and there was no opportunity for the Parents

to inquire about, and require, a cogent explanation for the DOE's actions in regard to their

child's educational program. This constituted a failure on the part of the DOE with respect to its

statutory burden of production.

34.     The Parents' due process complaint notice contained allegations that the DOE had

represented that it was "capped" at a 6:1+1 program, which resulted in a pre-determined program

recommendation, and the due process complaint alleged that this pre-determined result operated

to deprive the Parents of their participation rights and denied H.H. educational opportunities. No

witnesses were presented by the DOE to contest this allegation or to explain how the terms of the

IEP could meet H.H.'s areas of need, particularly with respect to his need for constant 1:1 teaching support. Thus, a finding of impermissible pre-determination was warranted.

35.     The IEP did not inform the Parents how H.H. could access academics and develop learning skills in a 6:1+1 setting. The document, instead, only described how H.H.'s instructional needs were being met exclusively through 1:1 support. Thus, the IHO should have found that there was insufficient information, and a total lack of evidence, to support the DOE's program recommendation.

36.     The goals listed in the IEP pertained *only* to 1:1 related service therapies, and all the short-term objectives that were recited in the IHO's decision were explicitly categorized in the IEP as "Speech" goals (Ex. 1-18, 1-19) for the 1:1 speech therapist-- not the teacher -- to implement. The IEP was devoid of goals and devoid of sufficient information regarding H.H.'s classroom or academic objectives which, presumably, would be implemented during the 35 periods per week of "all core subjects" (Ex. 1-20) and there is no mention of how academics would be measured, thereby defeating the Parents' reliance and enforcement rights. The IHO should have, therefore, determined that the IEP was procedurally defective and that H.H. was deprived of educational benefits as a result.

37.     The IHO misinterpreted the Parents' claim that the IEP could not be implemented, at any school location, because the service mandates exceeded the number of hours in a school week (Ex. A-3). The IHO did not address the substance of this claim, which was a valid implementation challenge. In this regard, the DOE did not demonstrate that its mandate of 43 periods and sessions, along with 5 periods of lunch, could be implemented in accordance with legal restrictions regarding the number of hours in a school week (*see* Regulations of the Commissioner of Education § 175.5).

38.     The DOE also failed to establish that the IEP mandates and terms were reasonably

designed to accommodate H.H.'s deficits, in terms of his academic and therapeutic stamina,

given his sensory and other significant areas of need.

### The State Review Officer's Decision

39.     The Parents timely appealed IHO DeFontes's decision to the State Review

Officer. The Parents submitted, as "additional evidence," the prior 2021-2022 IHO decision as

final and binding proof of H.H.'s need for 1:1 SETSS support and instruction throughout the

school day. H.H.'s need for this level of support remained consistent between the summer of

2022 and the commencement of the 2022-2023 school year.

40.     On February 20, 2024, State Review Officer Justyn Bates issued a decision

upholding the Findings of IHO DeFontes and dismissing the Parents' appeal.

41.     Although the SRO initially expressed concern that the IHO relied on an exhibit -

the student's prior IEP-  which was admitted by the IHO into the record *sua sponte*, without

notice to the parties (*see* SRO Decision at 8), the SRO then unfairly refused to allow the Parents

to amplify the record, by submitting as additional evidence, a document that undermined the

content and substance of the IHO's Exhibit. This document, the Findings of Fact and Decision of

a prior IHO, conclusively determined that the prior IEP deprived the student of a FAPE. Thus,

the prior IEP should not have been entered into evidence or considered by the IHO without a

concurrent acknowledgment that the IEP was deemed to have violated the student's right to a

FAPE; that the services recommended therein were deficient; and that the Parents were

compelled to seek alternative educational options. The SRO, therefore, erred in rejecting the

additional evidence submitted by the Parents.

42.     The SRO erred in concluding that "the district's evidence was sufficient to establish that it offered the student a FAPE for the 2022-2023 school year" (SRO Decision at 10). The SRO's determinations on this issue are arbitrary and capricious and not supported by the record below.  The SRO did not hold the DOE to its statutory burden of proof or its statutory burden of production, as mandated by New York statute (*see* N.Y. Educ Law §4404 [1][c]). The DOE was legally obligated to consider the student's most recent neuropsychological evaluation, yet this report was not listed as an evaluation that was considered in the DOE's Prior Written Notice, in the IEP itself, nor was it offered by the DOE as evidence in chief to support the IEP. This is not surprising given that the neuropsychological evaluation undermines a finding that the IEP program recommendation was appropriate and reasonably designed to meet H.H.'s needs. The DOE did not consider the substance and import of H.H.'s most recent neuropsychological evaluation, which was quite descriptive about his level of need. The DOE presented no evidence as to the documents that were actually considered by the CSE, and how these documents bore upon the development of the IEP and program recommendation. The record, therefore, belies the legitimacy of any finding that the District sustained its burden of production or its ultimate burden of proof. All the material delineated in the DOE's Prior Written Notice, and described in the IEP, *only* supported the consensus that 1:1 instruction was necessary in order for H.H. to make progress appropriate to his circumstances. No evidence had been presented by the DOE to justify the District's recommendation of a 6:1+1 program. The IHO and SRO were duty-bound to apply New York statutory law and to center the analysis on the fact that the DOE *only* relied on documents that supported a finding that H.H. required 1:1 instructional and related services support in order to make meaningful progress. A finding that the DOE sustained its burden of

proof on this record is arbitrary, capricious, unwarranted and is not reflective of sound and careful reasoning.

43.     The DOE also failed to submit the teacher ("Turning 5") progress report, which was critical to legitimately and critically assessing H.H.'s academic needs and functional performance in a classroom. The absence of the teacher report in circumstances such as these, in which the DOE produced no witnesses and no testimony, should have been found by the SRO to have been fatal to the DOE's ability to sustain its burden of proof, and fatal to any defense of the IEP given the mandate by the United States Supreme Court that a school district is required to provide a cogent and responsive explanation for their decisions. *See Endrew F. v. Douglas County School Dist. R.E.-1*, 580 U.S. at p. 16 (2017).

44.     Instead, the SRO cursorily listed the only documents that the DOE offered into the record – the April 2022 IEP, a prior written notice, a school location letter, a social history report, a physical therapy progress report, a speech-language therapy progress report, and an occupational therapy progress report, and then without analysis or explanation leaps to the conclusion that the documents establish the appropriateness of H.H.'s educational program. There was, however, no *academic* progress report discussing H.H.'s needs and abilities entered into the record by the DOE. The documents that the DOE submitted, namely, the related service provider reports, substantiate that 1:1 related services were provided to H.H. and that he urgently needed 1:1 support at all times. The independent neuropsychological evaluation, which was not considered by the CSE, corroborated H.H.'s need for 1:1 support. The SRO's determinations on this issue are arbitrary and capricious and not supported by the record below.

45.     The SRO further erred in determining that H.H. would be able to learn in a six-student classroom without being provided with 1:1 instruction because the CSE included

multiple management needs in H.H.'s IEP. None of these management needs provided for 1:1 instruction and there is nothing in the record to even suggest that the single teacher in the 6:1+1 classroom would be able to offer or provide H.H. with the amount of 1:1 instruction he required. The other students in the 6:1+1 classroom *each* required significant attention from the single teacher assigned to the class given that each and every student was identified as a student "whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention." SRO Decision at 16 citing 8 NYCRR 200.1(ww)(3)(i)(d). The SRO's determinations on this issue are arbitrary and capricious and not supported by the record below, particularly in the glaring absence of any evidence from the DOE regarding how H.H.'s needs could be met in the offered placement.

46.     The SRO erred in rejecting the Parents' claim of pre-determination. SRO Decision at p.12. The DOE did not present any evidence to contest or refute this claim, even though the DOE bore the burden of production and persuasion. The SRO committed legal error in stating that the Parents should not come to a hearing "expecting that the District will call witnesses to help the parents make their own points" (SRO Decision atp. 11, fn.10).  The DOE bore a Prong I burden of proof at all times and the Parents were, and are, entitled to rely on New York State statutory requirements as well as United States Supreme Court precedent obligating the DOE to  present a responsive explanation regarding all claims noticed in a due process complaint, which here encompassed, *inter alia*, allegations of pre-determination that deprived the Parents of their right to meaningfully participate in the decision-making process regarding their son as well as depriving H.H. of educational opportunities (Ex. A-2).

47.     The SRO committed legal error in rejecting the Parents' claim that the goals were insufficient. SRO Decision at pp. 14 -15. The IEP does not delineate any academic goals. The

record is also devoid of any evidence that the goals in the IEP were appropriate to meet H.H.'s academic needs or that they could be implemented in a 6:1+1. There was no teacher report submitted by the District nor were any witnesses called to address the appropriateness of the goals. The goals delineated in the IEP were categorized as Speech and OT goals, which would be implemented by the related service provider in a 1:1 method of delivery. No witnesses were called to clarify or explain whether the goals and objectives were to be considered "academic goals" to be implemented in a 6:1+1 setting and whether this method of delivery would be effective to meet H.H.'s needs given that all the documentation supplied by the DOE indicates that he requires a 1:1 method of delivery. The SRO erred in concluding, without any substantiation, that the goals were academic rather than 1:1 related service goals.

48.     The SRO erred in concluding that the Parents' right to meaningfully participate in the placement decision process was not violated by the DOE's failure to schedule a school tour to enable the Parents to appropriately visit, investigate and assess the appropriateness of the proposed school placement. SRO Decision at pp.18-19. For a student with needs as significant as H.H.'s needs are, which include safety concerns due to H.H.'s proclivity to eloping as well as his communication barriers and sensory obstacles, it was critical for the Parents to be able to tour the assigned school site and the SRO should have determined that the Parents rights in this regard were violated, resulting in the denial of a free and appropriate public education ("FAPE").

49.     The SRO committed legal error by holding that the question of whether the DOE was able to implement 43 periods of instruction per week was not ripe for his review because H.H. had not been enrolled in the public school and any review would be hypothetical.   This is not only incorrect as a proposition of law, but further ignores the fact that—whether or not the DOE was required to do so—it had selected the school for H.H. and failed to respond to the

Parents' allegation that the school would be unable to implement a special education program that was longer than the school day allowed for. This is not a speculative claim as the SRO found. SRO decision at pp. 20-22. Rather it is a purely legal claim that is tethered to the regulations that have been promulgated by the Commissioner of Education regarding the maximum length of a school day based on the permitted number of hours in a school year. The number of periods per day that were proposed for H.H. also has a significant bearing upon the appropriateness of the program and whether it was reasonably calculated to meet H.H.'s needs given information in the record regarding his limited stamina and the maladaptive and sensory-seeking behaviors that ensue when H.H. feels overwhelmed and lacks the stamina to continue with instruction or educational activities, which would likely be exacerbated in a 6: 1+1 setting.

50.     The SRO did not reach the questions of whether the Shirley Aninias School was an appropriate placement for H.H. or whether the equities favored H.H.'s parents. Each of these issues should be determined to be in the Parents' favor.

**First Claim for Relief**
**(Denial of FAPE in Violation of the IDEA)**

51.     Plaintiffs repeat and reallege the allegations stated in paragraph 1 through 50 as if fully set forth herein.

52.     In violation of the IDEA, 20 U.S.C. § 1400 *et seq.*, Defendants denied H.H. a FAPE for the 2022-2023 academic year.  Such denial results from the substantive and procedural inadequacies in the IEP and the proposed placement, as described above or as otherwise may be established.

**Second Claim for Relief**
**(Denial of Rights Under Section 504 of the Rehabilitation Act)**

53.     Plaintiffs repeat and reallege the allegations stated in paragraphs 1 through 50 as if fully set forth herein.

54.     By failing to confer the benefits provided to H.H. under the IDEA as amended (20 U.S.C. § 1400 *et seq.*), Defendants have violated Section 504 of the Rehabilitation Act (29 U.S.C. § 794) and the regulations promulgated thereunder.

**Third Claim for Relief**
**(Denial of Rights Under New York State Law)**

55.     Plaintiffs repeat and reallege the allegations stated in paragraphs 1 through 50 as if fully set forth herein.

56.     Defendants have violated Article 89 (N.Y. Educ. Law § 4400 *et seq.*) and regulations promulgated thereunder by failing to provide H.H. with a FAPE as set forth above or otherwise is established.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

a.     reverse the SRO's decision of February 20, 2024;

b.     hold that the DOE failed to provide H.H. with a FAPE for the 2022-2023 school year;

c.     determine that the Shirley Aninias School was an appropriate program for H.H. and conferred meaningful educational benefit upon him during the 2022-2023 school year;

d.     order the DOE to reimburse Plaintiffs for tuition costs paid to the Shirley Aninias School and all related costs and expenses incurred by the Parents for the 2022-2023 school year;

e.     declare that Plaintiffs are the substantially prevailing party;

f.     grant leave, pursuant to governing law, to Plaintiffs' counsel to submit a fee application for the purpose of recovering statutory attorneys' fees and other recoverable costs incurred at the administrative level, the SRO level, and in this action; and,

21

g.      grant Plaintiffs any additional relief as the Court deems appropriate.

Dated:  New York, New York
        June 14, 2024

                                Respectfully Submitted,

                                **REGINA SKYER & ASSOCIATES, L.L.P.**

                                By:  /s/JESSE COLE CUTLER
                                        JESSE COLE CUTLER, ESQ.
                                        LINDA GOLDMAN, ESQ.
                                        SKYER & ASSOCIATES, L.L.P.
                                        142 Joralemon Street
                                        Brooklyn, NY 11201
                                        (212) 532-9736; jcutler@skyerlaw.com
                                        *Attorneys for H.H.*