

# The University of the State of New York

## The State Education Department
### State Review Officer
**www.sro.nysed.gov**

No. 23-292

**Application of a STUDENT WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Law Offices of Regina Skyer and Assoc., LLP, attorneys for petitioners, by Jesse Cutler, Esq.

Liz Vladeck, General Counsel, attorneys for respondent, by Irene Dimoh, Esq.

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioners (the parents) appeal from the decision of an impartial hearing officer (IHO) which determined that respondent (the district) offered the student appropriate educational programming and denied their request to be reimbursed for their son's tuition costs at the Shirley Aninias School (Shirley Aninias) for the 2022-23 school year. The appeal must be dismissed.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C. §§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[*l*]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]).  First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]).  An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]).  The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]).  A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]).  The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]).  The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4).  The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5).  The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]).  The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

**III. Facts and Procedural History**

The parties' familiarity with this matter is presumed and, therefore, the facts and procedural history of the case and the IHO's decision will not be recited in detail here.  The student has received a diagnosis of autism spectrum disorder (ASD) with an accompanying language impairment (Parent Ex. C at p. 11).  On August 25, 2021 the Committee on Preschool Special Education (CPSE) convened and determined that the student was eligible for special education services as a preschool student with a disability (IHO Ex. I).  The CPSE developed an IEP with an implementation date of September 13, 2021, and recommended that the student receive 12-month services consisting of 25 30-minute sessions per week of group special education itinerant teacher (SEIT) services; three 30-minute sessions per week of individual speech-language therapy; three

30-minute sessions per week of individual occupational therapy (OT); two 30-minute sessions per week of physical therapy (PT); together with one 60-minute session per month of group parent counseling and training (id. at pp. 22-23).[1]  The CSE convened on April 1, 2022, found the student eligible for special education services as a student with autism, and formulated the student's IEP with an implementation date of September 1, 2022 (see generally Dist. Ex. 1).[2]  The April 2022 CSE recommended 12-month services consisting of a 6:1+1 special class placement in a district specialized school together with related services of three 30-minute sessions per week of individual OT, two 30-minute sessions per week of individual PT, and three 30-minute sessions per week of individual speech-language therapy (id. at pp. 20-21).

In a June 17, 2022 letter to the district, the parents asserted that the CSE failed to develop a "procedurally and substantively appropriate" IEP for the student for the 12-month 2022-23 school year (see Parent Ex. B).  In particular, the parents alleged that the student's "last IEP expire[d] before the end of the 2021-22 school year and the IEP most recently developed for him [wa]s not to be implemented until September 2022," which left the student without an educational program for summer 2022 (id. at p. 2).  The parents further alleged that the district failed to identify a public school site to implement the student's IEP for the 2022-23 school year and, as a result, notified the district of their intent to unilaterally place the student at Shirley Aninias f/k/a Ready Set Play for the 2022-23 school year (id. at pp. 1-2; see Parent Ex. D at p. 1).[3]  In a due process complaint notice, dated August 18, 2023, the parents alleged that the district failed to offer the student a free appropriate public education (FAPE) for the 2022-23 school year (see Parent Ex. A).  The parents asserted that the district could not implement the IEP recommended for the 2022-23 school year; the IEP failed to contain academic annual goals; the parents were denied meaningful participation in the CSE process; and the parents were unable to tour the assigned school (Parent Ex. A at pp. 2-3).  As relief, the parents sought funding of the "full-time SEIT

[1] State law defines SEIT services (or, as referenced in State regulation, "Special Education Itinerant Services" [SEIS]) as "an approved program provided by a certified special education teacher . . . , at a site . . . , including but not limited to an approved or licensed prekindergarten or head start program; the child's home; . . . or a child care location" (Educ. Law § 4410[1][k]; 8 NYCRR 200.16[i][3][ii]; see "[SEIS] for Preschool Children with Disabilities," Office of Special Educ. Field Advisory [Oct. 2015], available at https://www.nysed.gov/sites/default/files/programs/special-education/specialeducationitinerantservicesforpreschoolchildrenwithdisabilities.pdf.  In addition, SEIT services are "for the purpose of providing specialized individual or group instruction and/or indirect services to preschool students with disabilities" (8 NYCRR 200.16[i][3][ii] [emphasis added]; see Educ. Law § 4410[1][k]).

[2] The student's eligibility for special education as a student with autism is not in dispute (see 34 CFR 300.8[c][1]; 8 NYCRR 200.1[zz][1]).

[3] The Commissioner of Education has not approved Shirley Aninias as a school with which districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d]; 200.7).

support and related services on an extended day basis" for the 2022-23 school year together with the costs of transporting the student to and from Shirley Aninias (id. at p. 3).[4, 5]

    After a prehearing conference on September 20, 2023, an impartial hearing convened before the Office of Administrative Trials and Hearings (OATH) on October 19, 2023 (Tr. pp. 1-69).  In a corrected decision dated November 1, 2023, the IHO determined that the district met its burden to establish that it offered the student a FAPE for the 2022-23 school year, and dismissed the parents' due process complaint notice (IHO Decision at pp. 5-11).[6]  In particular, the IHO found that the April 2022 IEP "complied with the procedural requirements of the IDEA and was reasonably calculated to enable [the] [s]tudent to make progress appropriate in light of his unique circumstances" (id. at p. 5).  The IHO found that the April 2022 IEP had measurable annual goals which corresponded with the student's needs (id. at p. 6).  Further, the IHO found that the student was not eligible for SEIT services and did not require special education teacher support services (SETSS) to receive a FAPE (id. at p. 8).[7]  The IHO found that the recommended 6:1+1 special class was appropriate to meet the student's needs and any claims regarding implementation of the IEP at the assigned school were speculative (id. at pp. 9-10).

## IV. Appeal for State-Level Review

    The parents appeal.  The parties' familiarity with the particular issues for review on appeal in the parents' request for review and the district's answer thereto is also presumed and, therefore, the allegations and arguments will not be recited here in detail.  At the outset, the parents seek the introduction of additional evidence (Req. for Rev. at p. 2).  The parents claim that the IHO erred in finding that the annual goals were measurable and addressed the student's needs (id. at pp. 8-9).  The parents assert that IHO erred because the district failed to meet its burden to establish that the

---

[4] The Shirley Aninias tuition was comprised of the following: $148,350 for SEIT services; $12,075 for speech-language therapy services; $12,075 for OT services; and $11,960 for PT services, for a total tuition from July 6, 2022 through June 27, 2023 in the amount of $184,460 (Parent Exs. D; E at p. 1; K at p. 7; M).

[5] The parents engaged a private company to provide the student's transportation services beginning on July 12, 2022 and continuing through June 24, 2023, which consisted of $180 for each trip to and from Shirley Aninias for a total of $360 per day and a total cost of $75,515.91 for the 2022-23 school year (Parent Exs. K at p. 8; N).

[6] The IHO decision was corrected to add IHO exhibit I to the list of evidence considered in the IHO's decision (IHO Decision at pp. 1, 13).

[7] The term SETSS is not defined in the State continuum of special education services (see NYCRR 200.6), and it went largely undefined in the hearing record in this case.  As has been laid out in prior administrative proceedings, the term is not used anywhere other than within this school district and a static and reliable definition of "SETSS" does not exist within the district, and unless the parties and the hearing officer take the time to develop a record on the topic in each proceeding it becomes problematic (see Application of the Dep't of Educ., Appeal No. 20-125). For example, SETSS has been described in a prior proceeding as "a flexible hybrid service combining Consultant Teacher and Resource Room Service" that was instituted under a temporary innovative program waiver to support a student "in the general education classroom" (Application of a Student with a Disability, Appeal No. 16-056), and in another proceeding it was suggested that SETSS was more of an a la carte service that is completely disconnected from supporting the student in a general education classroom setting (Application of a Student with a Disability, Appeal No. 19-047). SETSS is not defined in the State continuum of special education services (see 8 NYCRR 200.6).

recommended 6:1+1 special class met the student's needs as the district failed to offer any witness testimony to support its recommendations (id. at pp. 6-8). Next, the parents argue that the IHO erred in finding that the parents' IEP implementation claim was speculative, and the parents had the right to visit the assigned school but were denied the opportunity to do so (id. at pp. 9-10). Lastly, the parents claim that the IHO should have found that Shirley Aninias was an appropriate unilateral placement and equitable considerations favored an award of tuition reimbursement and transportation costs (id.).

In its answer, the district denies the material allegations contained in the request for review. The district asserts that the IHO correctly determined that the district offered the student a FAPE for the 2022-23 school year. The district asserts that contrary to the parents' argument, its failure to offer witness testimony was "not dispositive" in determining whether the district met its burden, and noted the documented process called for by the IDEA that it followed with respect to the student (Answer ¶ 12). Furthermore, the district argues that the parents' implementation claim was "pure speculation"; that the proposed additional evidence should be excluded from the hearing record; any deficiencies in the annual goals do not rise to the level of a denial of FAPE; and the parents' participation in the April 2022 CSE meeting undermined any claim of predetermination (id. ¶¶ 13-16). Lastly, the district argues that even if there is a finding of a denial of FAPE the student's unilateral placement at Shirley Aninias was not an appropriate unilateral placement (id. ¶¶ 18-19).

## V. Applicable Standards

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 151, 160 [2d Cir. 2014]; R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP'" (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley, 458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]). The Supreme Court has indicated that "[t]he IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement" (Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399 [2017]). While the Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may

cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]).  Under the IDEA, if procedural violations are alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; R.E., 694 F.3d at 190; M.H., 685 F.3d at 245).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203).  However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak, 142 F.3d at 130; see Rowley, 458 U.S. at 189).  "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created" (Endrew F., 580 U.S. at 404).  The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379).  Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132).  Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see T.P., 554 F.3d at 254; P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]).  The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Endrew F., 580 U.S. at 403 [holding that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"]; Rowley, 458 U.S. at 192).  The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and

provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]).[8]

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]; R.E., 694 F.3d at 184-85; T.P., 554 F.3d at 252).  In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; see Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192).  "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see R.E., 694 F.3d at 184-85).

## VI. Discussion

### A.  Preliminary Matters

#### 1.  Additional Evidence

The parents submit as additional documentary evidence a prior IHO decision dated September 8, 2022 pertaining to the student for the 2021-22 school year (Req. for Rev. at p. 2). The parents argue that "[n]either party introduced [the August 25, 2021 IEP] into evidence, however, the IHO referenced it in [his] decision and included it in the record as an IHO exhibit, without prior notice" (Req. for Rev. at p. 2; IHO Decision at p. 10; see IHO Ex. I).  The parents claim that in the prior proceeding that IHO found that the August 2021 IEP was not appropriate to meet the student's needs and denied the student a FAPE for the 2021-22 school year, and the parents seek to introduce the prior decision as evidence in this matter "in order to have a fair and complete record given this IHO's sua sponte decision to consider the 2021-2022 IEP as evidence" (Req. for Rev. at p. 2).  The district opposes the parent's request to admit the prior IHO decision as additional evidence because neither party sought its introduction during the impartial hearing, and the decision does not establish that the district failed to offer the student a FAPE for the 2022-23 school year (Answer ¶ 14).

Generally, documentary evidence not presented at an impartial hearing is considered in an appeal from an IHO's decision only if such additional evidence could not have been offered at the

---

[8] The Supreme Court has stated that even if it is unreasonable to expect a student to attend a regular education setting and achieve on grade level, the educational program set forth in the student's IEP "must be appropriately ambitious in light of his [or her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom.  The goals may differ, but every child should have the chance to meet challenging objectives" (Endrew F., 580 U.S. at 402).

time of the impartial hearing and the evidence is necessary in order to render a decision (see, e.g., Application of a Student with a Disability, Appeal No. 08-030; Application of a Student with a Disability, Appeal No. 08-003; see also 8 NYCRR 279.10[b]; L.K. v. Ne. Sch. Dist., 932 F. Supp. 2d 467, 488-89 [S.D.N.Y. 2013] [holding that additional evidence is necessary only if, without such evidence, the SRO is unable to render a decision]).

As an initial matter, it is unclear how the August 2021 IEP became an exhibit in the hearing record (see Tr. pp. 1-69; see IHO Ex. I). The IHO decision referenced the August 2021 IEP in connection with the parents' claim that the district failed to offer the student services in July and August 2022 (IHO Decision at p. 10). The IHO stated that the August 2021 IEP "refuted" the parents' claim because the August 2021 IEP recommended 12-month services including July and August 2022 (id.).

Unless specifically prohibited by regulations, IHOs are provided with broad discretion, subject to administrative and judicial review procedures, with how they conduct an impartial hearing, in order that they may "accord each party a meaningful opportunity" to exercise their rights during the impartial hearing (Letter to Anonymous, 23 IDELR 1073 [OSEP 1995]; see Impartial Due Process Hearing, 71 Fed. Reg. 46704 [Aug. 14, 2006]). An IHO must provide all parties with an opportunity to present evidence and testimony, including the opportunity to confront and cross-examine witnesses (34 CFR 300.512[a][2]; 8 NYCRR 200.5[j][3][xii]). While an IHO is required to exclude evidence and may limit the testimony of witnesses that he or she "determines to be irrelevant, immaterial, unreliable or unduly repetitious" (8 NYCRR 200.5[j][3][xii][c]-[e]), it is also an IHO's responsibility to ensure that there is an adequate and complete hearing record (see 8 NYCRR 200.5[j][3][vii]). Further, State regulation provides that nothing shall impair or limit the IHO in his or her ability to ask questions of counsel or witnesses for the purpose of clarifying or completing the hearing record (8 NYCRR 200.5[j][3][vii]).

Moreover, it is essential that the IHO disclose his or her intention to reach an issue which the parties have not raised as a matter of basic fairness and due process of law (Application of a Child with a Handicapping Condition, Appeal No. 91-40; see John M. v. Bd. of Educ. of Evanston Tp. High Sch. Dist. 202, 502 F.3d 708, 713 [7th Cir. 2007]). Although an IHO has the authority to ask questions of counsel or witnesses for the purposes of clarification or completeness of the hearing record (8 NYCRR 200.5[j][3][vii]), or even inquire as to whether the parties agree that an issue should be addressed, it is impermissible for the IHO to simply expand the scope of the issues raised without the express consent of the parties and then base his or her determination on new issues raised sua sponte (see Dep't of Educ., Hawai'i v. C.B., 2012 WL 220517, at *7-*8 [D. Haw., Jan. 24, 2012] [finding that the administrative hearing officer improperly considered an issue beyond the scope of the parents' due process complaint notice]). Nevertheless, the IHO should not sua sponte enter evidence into the hearing record without giving the parties notice of his intent do so or receiving evidence on the issue.

Next, the Prior IHO decision the parents offer as additional evidence is dated September 8, 2022 and therefore, was available at the time of the impartial hearing. This prior IHO decision was due to allegations that district failed to offer a FAPE for the 2021-22 school year. The parents seemingly seek to have the September 2022 IHO decision considered in order to demonstrate that the August 2021 IEP relied on by the IHO was itself found to be inappropriate, a fact that they

argue is not reflected in the impartial hearing record. However, the parent's argument has several flaws. First, the IHO in the present matter was not bound by the September 2022 IHO decision concerning a different school year, which was based on a different hearing record that was not before the IHO in this proceeding. Although the September 2022 IHO's decision has become final and binding on the parties relative to the student's 2021-22 school year, the prior decision is not binding on the IHO's or SRO's consideration of the merits of the parents' requested relief pertaining to the 2022-23 school year and does not in and of itself provide a basis for a finding that the IHO erred with respect to his determinations regarding the 2022-23 school year at issue.[9]

Accordingly, the prior IHO decision is not necessary to render a decision in this matter, and in an exercise of my discretion, I decline to accept the parents' additional documentary evidence for consideration on appeal.

### 2. Burden of Proof and Predetermination

Turning to the parents' allegations regarding burden of proof, they assert that it was "incumbent" on the district to "establish and explain" how the recommended 6:1+1 special class could meet the student's needs (Req. for Rev. at pp. 6-7). The parents argue that the evidence in the hearing record, which lacks any testimonial evidence, does not support the IHO's finding that a 6:1+1 special class could meet the student's needs (id. at p. 8). Additionally, the parents argue that the IHO erroneously shifted the burden of proof and used the incorrect standard of proof by stating that there was "insufficient evidence to conclude that [the student] require[d] SEIT [or SETSS] type services" and "there [wa]s no clear and convincing evidence that 1:1 SETSS or equivalent services [we]re necessary for [the student] to receive a FAPE" (id. at pp. 7-8). The parents argue that the standard of proof is a "preponderance of evidence," and it was not their burden to demonstrate what services the student required (id. at p. 8). In response, the district argues that although it was "regrettable" that the district "did not have a witness on hand, it is not dispositive that the [district] failed to meet its burden" (Answer ¶ 12). Further, the district asserts that it offered sufficient evaluative information to support its recommendation for a 6:1+1 special class including prior written notices of its recommendation (id.).

Under the IDEA, the burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (see Schaffer v. Weast, 546 U.S. 49, 59-62 [2005] [finding it improper under the IDEA to assume that every IEP is invalid until the school district demonstrates that it is not]). However, under State law, the burden of proof has been placed on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d 372, 386 [2d Cir. 2014]; C.F. v. New York City Dep't of Educ., 746 F.3d 68, 76 [2d Cir. 2014]; R.E., 694 F.3d at 184-85). Ordinarily, however, which party bore the burden of persuasion in the impartial hearing becomes relevant only if the case is one of those "very few" in which the evidence is equipoise (Schaffer, 546 U.S. at 58; Reyes v. New York City Dep't of Educ., 760 F.3d 211, 219 [2d Cir. 2014]; M.H.

---

[9] Furthermore the September 2022 IHO decision did not analyze the strengths or weaknesses of the August 2021 IEP, it merely held that the district waived its case and therefore failed to meet its burden, much to the IHO's annoyance, when it failed to offer any documentary or testimonial evidence.

v. New York City Dep't of Educ., 685 F.3d 217, 225 n.3 [2d Cir. 2012]; T.B. v. Haverstraw-Stony Point Cent. Sch. Dist., 933 F. Supp. 2d 554, 565 n.6 [S.D.N.Y. 2013]; A.D. v. New York City Dep't of Educ., 2013 WL 1155570, at *5 [S.D.N.Y. Mar. 19, 2013]; see F.L. v. New York City Dep't of Educ., 553 Fed. App'x 2, 4 [2d Cir. Jan. 8, 2014]).

The parents argue that the district could not have met its burden of proof without testimonial evidence. Undoubtedly, it appears that the district wanted to present a witness, but was unable to, and in some cases such circumstances could result in a finding that the district failed to meet its burden of proof; however, under the specific circumstances of this case and given the nature of the claims pursued by the parents on appeal, the district's evidence was sufficient to establish that it offered the student a FAPE for the 2022-23 school year as further described below.

Ideally, if a district intends to rest its case on documentary evidence alone, the district should offer into evidence all documentation pertaining to the evaluation of the student and the CSE's recommendations, including prior written notices (34 CFR 300.503[a]; 8 NYCRR 200.5[a]; see also L.O. v. New York City Dep't of Educ., 822 F.3d 95, 110-11 [2d Cir. 2016] [discussing the consequences of a CSE's failure to adequately document evaluative data, including that reviewing authorities might be left to speculate as to how the CSE formulated the student's IEP]). Here, the district did offer as evidence the April 2022 IEP; a prior written notice of recommendation dated May 18, 2022; a prior written notice of school location dated June 15, 2022; a social history report dated March 11, 2022; a PT progress report dated December 15, 2021; a speech-language therapy progress report dated December 15, 2021; and an OT progress report dated December 7, 2021 (see Dist. Exs. 1-7). Information from the PT, OT, and speech-language therapy progress reports were contained in the April 2022 IEP to describe the student's present levels of performance (compare Dist. Ex. 1 at pp. 4-8, with Dist. Exs. 5-7). This evidence was sufficient for the IHO to address the particular issues raised by the parents. A review of the IHO's decision shows that the available evidence in the hearing record led the IHO to find that the IEP adequately addressed the student's needs and that there was no contrary evidence that would rebut that conclusion (i.e., evidence that the student required full-time 1:1 special education instruction); accordingly, the actual analysis of the relevant evidence by the IHO did not represent a shift of the burden of persuasion to the parents to demonstrate the IEP's substantive deficiency (see E.E. v. New York City Dep't of Educ., 2018 WL 4636984, at *11 n.13 [S.D.N.Y. Sept. 26, 2018]; Application of a Student with a Disability, Appeal No. 18-058; see also C.F., 746 F.3d at 76 [noting that "the Department bears the burden of establishing the validity of the IEP"]).

The district's representative stated its position on the hearing record at the outset of the second hearing date—that the district was "defending FAPE," the unilateral placement was not appropriate for the student, and there were equitable considerations for the IHO to analyze—and made a closing statement arguing that the student was offered a FAPE for the 2022-23 school year (see Tr. pp. 18-19, 31, 55-63).

In furtherance of their argument regarding the lack of district witnesses, and in support of their claim that the district predetermined the student's program, the parents assert they did not have the opportunity to question district witnesses as to how the CSE came to recommend a 6:1+1 special class (Req. for Rev. at p. 6). The parents assert that the "right to confront witnesses was key" in light of the sworn testimony of the student's father regarding predetermination and his

10

assertion that someone at the April 2022 CSE meeting represented that the district was "capped" in making the recommendation for a 6:1+1 special class (id. at pp. 6-7).[10]  Further, the parents assert that this "uncontested" allegation of predetermination deprived the parents of meaningful participation in the CSE process (id. at p. 7).[11]

In his direct affidavit testimony, the student's father testified that at the April 2022 CSE meeting the parents "were told that the [district] would be recommending a 6:1[+]1 program for [the student] because their choices were 'capped at this IEP meeting,' and they were required to make such a program recommendation" (Parent Ex. K at p. 4).  The student's father further testified that he did not think that anyone at the April 2022 CSE meeting "actually believed that the 6:1[+]1 program was appropriate for [the student] and they were simply recommending what they had been told to do" (id.).  Contrary to this statement, as discussed below, there is ample information in the hearing record that was provided by the CSE as to why the 6:1+1 special class was recommended for the student.

The April 2022 CSE considered other options in determining the appropriate program for the student (Dist. Exs. 1 at p. 27; 2 at p. 2).  In particular, the CSE considered integrated co-teaching services, which were rejected because the student required "more intensive support" (Dist. Exs. 1 at p. 27; 2 at p. 2).  Additionally, the CSE considered a 12:1+1 special class in a district community school and an 8:1+1 special class in a district specialized school, but both were rejected as the student required a "smaller setting given his global needs" (Dist. Exs. 1 at p. 27; 2 at p. 2).  The testimony of the student's father regarding the use of the term "capped" at the April 2022 CSE is unclear considering the various options the IEP reflected that the CSE considered during the meeting.

In anticipation of the April 2022 CSE meeting, the student's mother participated in a social history update interview on March 11, 2022 wherein she discussed the student's current school performance and areas in which she wanted to see improvement (see Dist. Ex. 4).  Furthermore,

---

[10] Whether it prevails or not, subject to any reasonable directives of the IHO, the district's legal representatives may determine how best to pursue its strategies during the impartial hearing, and the right to confront witnesses of which the parents now complain means that the parents were free call or even subpoena a witness from the district that the parents counsel felt was appropriate in order to make their own case. The parents should not come to a hearing expecting that the district will call witnesses to help the parents make their own points before the IHO.  Here the parents did not initially seek to call any particular witnesses from the district, nor did they ask the IHO for additional time to do so after it became apparent that the district would not presenting witness testimony.

[11] As to predetermination, the consideration of possible recommendations for a student prior to a CSE meeting is not prohibited as long as the CSE understands that changes may occur at the CSE meeting (T.P., 554 F.3d at 253; A.P. 2015 WL 4597545, at *8-*9; see 34 CFR 300.501[b][1], [3]; 8 NYCRR 200.5[d][1], [2]).  The key factor with regard to predetermination is whether the district has "an open mind as to the content of [the student's] IEP" (T.P., 554 F.3d at 253; see D.D-S., 2011 WL 3919040, at *10-*11; R.R. v. Scarsdale Union Free Sch. Dist., 615 F. Supp. 2d 283, 294 [E.D.N.Y. 2009], aff'd, 366 Fed. App'x 239 [2d Cir. Feb. 18, 2010]).  Districts may "'prepare reports and come with pre[-]formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions'" (DiRocco v. Bd. of Educ. of Beacon City Sch. Dist., 2013 WL 25959, at *18 [S.D.N.Y. Jan. 2, 2013] [alternation in the original], quoting M.M. v. New York City Dept. of Educ. Region 9 (Dist. 2), 583 F. Supp. 2d 498, 506; [S.D.N.Y. 2008]; see B.K. v. New York City Dep't of Educ., 12 F. Supp. 3d 343, 358-59 [E.D.N.Y. 2014] [holding that "active and meaningful" parent participation undermines a claim of predetermination]).

the parents participated in the April 2022 CSE meeting and shared their observations of the student, for example at the beginning of the school year the student would engage in "escape behaviors" and walk away but they saw less of this behavior at the time of the CSE meeting (Dist. Ex. 1 at pp. 5, 28). The parents also shared with the CSE that they wanted to "expand his language skills" and "increase his interest in interacting with peers" (id. at pp. 5, 7). Additionally, in terms of physical development, the parents wanted the student to "improve his attention, focus, adaptive and fine motor skills" (id. at p. 9).

The CSE considered the input of the parents and foregoing evidence demonstrates the type of active and meaningful participation that defeats a claim of predetermination. The parents had an opportunity to express their concerns and areas in which they wanted the student make improvement. Accordingly, the evidence in the hearing record does not support the parents' claims that the district predetermined its recommendations.

## B. April 1, 2022 IEP

### 1. Student's Needs

In this matter, although the sufficiency of the student's present levels of performance and individual needs as described in the April 2022 IEP are not in dispute on appeal, a discussion thereof provides context for the issues to be resolved, namely, whether the annual goals and 6:1+1 special class placement were appropriate to meet the student's needs.

As mentioned above, the April 2022 CSE considered evaluative information about the student from December 2021 "SEIT/Turning 5," speech-language progress, PT progress, and OT progress reports, as well as a March 2022 social history update (Dist. Exs. 1 at pp. 1-9; 2 at p. 2).[12] In general, in all areas of performance, review of the April 2022 IEP shows that the student's self-directed behaviors and difficulty sustaining attention were predominant concerns for the teachers and related services providers (see Dist. Ex. 1 at pp. 1-8). For example, regarding the student's cognitive development, the April 2022 IEP indicated the student exhibited greater than 33 percent delay and "self-directed, self-stimulatory and repetitive behavior" that "create[d] challenges for learning and demonstrating age-appropriate skills" (id. at p. 1). The April 2022 IEP indicated the student had difficulty engaging in and attending to activities and required redirection in the form of physical, verbal, and visual cues to focus on tasks (id.). The April 2022 IEP indicated that adult support, including modeling and prompting, was required to assist the student to sustain his attention, engage in functional play, and point to animals, letters, and numbers in books (id. at p. 2). The student did not imitate simple block designs or match/sort by size, but was beginning to demonstrate some quantifying skills, matched and sorted identical pictures/colors, and was able to count numbers 1-30 (id.). The April 2022 IEP indicated the student participated in pretend play scenarios "with modeling and verbal and physical prompting" but he did not demonstrate "understanding of the use of objects during pretend play" (id.).

In terms of the student's receptive language skills, the April 2022 IEP noted that the student had made progress, but this remained a challenging area for the student because of his "self-

---

[12] The "SEIT/turning 5" report was not included in the hearing record (see Dist. Exs. 1-7).

directed behavior and restrictive interests" (Dist. Ex. 1 at p. 2). In addition, the student was described as being distracted from outside stimuli and self-stimulatory behaviors, which affected his ability to demonstrate "age-typical skills" (id.). While the student demonstrated "an understanding of common objects, toys, food, animals, colors, numbers, shapes[,] and letters by labeling, requesting them or when following directions," he was not independently identifying these objects and needed 1:1 teaching support with the use of modeling and prompting (id.). The April 2022 IEP indicated that the student was able to sit "more independently with the group" in the classroom but did not respond to questions or imitate words/phrases in a group setting (id. at p. 3). The student made progress with following one step directions and was "starting to follow some two-step commands" (id.).

Regarding the student's expressive language skills, the April 2022 IEP indicated that the student had made progress in his ability to make requests and imitate, but that his "articulation [was] not always clear" which made it difficult for adults and peers to understand him (Dist. Ex. 1 at p. 3). The April 2022 IEP indicated the student was working on increasing his vocabulary and had a vocabulary of approximately 50 words that he was able to use independently (id.). The student was "not yet using language in a reciprocal manner to communicate conversationally, comment[,] or describe experiences" (id.). The student's speech-language pathologist indicated that the student needed and "benefit[ted] from consistency and structure, as well as a multi-sensory approach to strengthen his skills" (Dist. Exs. 1 at p. 4; 6 at p. 1). She further reported that the student "require[d] moderate to maximum verbal and visual cueing to follow directions" because of his distractibility (Dist. Exs. 1 at p. 4; 6 at p. 2).

In connection with the student's social/emotional development, the April 2022 IEP again noted that the student exhibited self-directed behavior and was slow to develop a "social interest in others" (Dist. Ex. 1 at p. 5). The April 2022 IEP indicated that the student was "slowly developing his understanding of rules and expectations in different situations" (id. at p. 6). The student needed "predictable routines" as a change caused the student confusion or to become upset (id.). The April 2022 IEP stated that the student engaged in "mild tantrum behavior" including yelling, whining, or falling to the floor when there was a change in routine, denied requests, or denied preferred activities (id.). According to the IEP, the student's "self-directed behavior" affected transitions that included waiting or separating from preferred activities (id.).

As for the student's physical development, the April 2022 IEP indicated the student was observed to have "impaired balance, postural stability, muscle strength and control, fluidity and grading of movements, and endurance and coordination" (Dist. Exs. 1 at pp. 7-8; 5 at pp. 1, 3). The occupational therapist reported the student's sessions focused on "sensory processing, attention, self-care skills, visual[-]motor integration skills, grasping skills, and upper body strength and stability" (Dist. Exs. 1 at p. 8; 7 at p. 1). It was noted in the April 2022 IEP that the student did well in a 1:1 setting and needed hand-over hand assistance with new activities (Dist. Ex. 1 at p. 8; see Dist. Ex. 5 at p. 1). The student was reported to have made "some progress" with his adaptive skills but still needed reminders to "sustain his attention and self-directed behavior" (Dist. Ex. 1 at p. 8). The student was not yet toilet trained, although he had demonstrated some progress toward independence in this skill (id.). It was reported that the student was working on using two hands to grab and reach for toys and was working on his "grasp and pre-writing skills" (id. at p. 9).

### 2. Annual goals

The parents assert that the IHO erred in determining that the annual goals in the April 2022 IEP was appropriate, as it did not contain "academic goals for the special education teacher to implement" (Req. for Rev. at p. 8). The IHO noted that the CSE reviewed information relevant to his transition out of preschool programming and the IEP comprehensively detailed the student's strengths and areas of deficit and the goals addressed those areas (IHO Decision at p. 6). The Parents argued that the annual goals pertained "only" to skills addressed by related services (id. at p. 9). The parents assert that the IEP failed to contain "academic objectives" to be implemented during the student's time in the 6:1+1 special class (id.).

An IEP must include a written statement of measurable annual goals, including academic and functional goals designed to meet the student's needs that result from the student's disability to enable the student to be involved in and make progress in the general education curriculum; and meet each of the student's other educational needs that result from the student's disability (see 20 U.S.C. § 1414[d][1][A][i][II]; 34 CFR 300.320[a][2][i]; 8 NYCRR 200.4[d][2][iii]). Each annual goal shall include the evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal during the period beginning with placement and ending with the next scheduled review by the committee (8 NYCRR 200.4[d][2][iii][b]; see 20 U.S.C. § 1414[d][1][A][i][III]; 34 CFR 300.320[a][3]).

Throughout the April 2022 IEP present levels of performance, the student's primary needs were described as his ability to attend to activities, understand and use language, functionally engage in tasks, and demonstrate self-regulation skills (Dist. Ex. 1 at pp. 1-10).[13] The eight annual goals and numerous short-term objectives included in the IEP addressed the needs of the student as identified in the present levels of performance including improving his muscular strength, balance and motor coordination, functional grasp, self-care and daily living activities, self-regulation and attention, pragmatic communication, ability to assign meaning to verbal interactions, and ability to formulate four-to-five-word utterances (id. at pp. 12-19).[14]

Specifically, review of the recommended annual goals and short-term objectives shows that they addressed needs such as the student's ability to tolerate non-preferred activities, attend to activities, engage in meaningful exchanges, take turns, follow directions, use sensory strategies, comprehend basic concepts, communicate needs independently, identify familiar items and

---

[13] Although it is unclear if the February 2022 neuropsychological evaluation report was available to the April 2022 CSE, the SEIT reported "notable concerns around [the student's] pre-academic and conceptual functioning" to the neuropsychologist (Parent Ex. C at p. 7). The SEIT reported that the student was "able to identify letters and numbers" and "count from one to five, say[] the alphabet" and identify basic colors but "require[d] ongoing support for" basic concepts such as size comparisons, naming opposites, body parts, and "answering questions based on picture stories" (id.). The SEIT also shared with the neuropsychologist that the student "continue[d] to require support for sitting and attending; responding to feedback; following instructions; shifting away from self-directed behaviors; and regulating behaviors to process new concepts" (id. at p. 1).

[14] Additionally, each annual goal identified the criteria to determine whether the goal had been achieved (i.e., "4 out of 5 trials"), the method of measurement ("[t]eacher/[p]rovider [o]bservations"), and the schedule of when progress would be measured ("1 time per quarter") (Dist. Ex. 1 at pp. 12-19).

common verbs, respond to simple questions, and obtain attention using language, skills needed to engage in academic instruction (Dist. Ex. 1 at pp. 12-19). Moreover, although some annual goals were written with the heading of "[s]peech," the short-term objectives addressed a number of "academic" related needs that were identified in the present levels of performance such as identifying familiar items in pictures by pointing, identifying common verbs in pictures, comprehending basic concepts of shape and size, and understanding personal and possessive nouns (id. at p. 17).[15]  Additionally, to increase his expressive language skills the student's short-term objectives were to work on answering "WH" questions, responding to yes/no questions, combining words to communicate needs, using verbs to describe actions or pictures, and labeling familiar items in pictures (id. at p. 19).

I note that the IDEA does not require that a district create a specific number of goals for each of a student's deficits, and the failure to create a specific annual goal does not necessarily rise to the level of a denial of FAPE; rather, a determination must be made as to whether the IEP, as a whole, contained sufficient goals to address the student's areas of need. (J.L. v. New York City Dep't of Educ., 2013 WL 625064, at *13 [S.D.N.Y. Feb. 20, 2013]; see C.M. v. New York City Dep't of Educ., 2017 WL 607579, at *20-*21 [S.D.N.Y. Feb. 14, 2017]).  Overall, as to any claims that the April 2022 IEP was inappropriate because it failed to include academic goals, and, as noted above the parents did not raise any claims that the IEP mischaracterized or did not clearly identify the student's areas of need.  There is no dispute that the student had substantial cognitive, social emotional, and physical delays that required a significant amount of special education services to address, and the CSE identified those needs and created preacademic, academic readiness, and early academic goals to address the student's needs in his individual circumstances.

Accordingly, the evidence in the hearing record leads to the overall conclusion that the annual goals in the April 2022 IEP aligned with and targeted the student's needs identified in the present levels of performance, appropriately addressed the student's needs, and were sufficiently specific and measurable to guide instruction and to evaluate the student's progress over the course of the school year (see D.A.B. v. New York City Dep't of Educ., 973 F. Supp. 2d 344, 359-61 [S.D.N.Y. 2013]; E.F. v. New York City Dept. of Educ., 2013 WL 4495676, at *18-*19 [E.D.N.Y. Aug. 19, 2013]; D.B., 966 F. Supp. 2d at 334-35).  Thus, the IHO's determination that the annual

---

[15] State guidance with respect to IEP development is clear that the goals in an IEP are not to be directed at a particular teacher or provider.

> "8. Can a district add a subheading to the Measurable Annual Goals section of the IEP in order to indicate the particular service type that the goal pertains to? (Added 4/11)

> Goals are developed for the student, not the service provider. However, if a district wants to group annual goals by the need area (e.g., speech and language) they may do so.  However, the form may not be modified to insert service type.  The program and service recommendations to assist the student to meet the goals are documented in the next section of the IEP, not under the goals section.

("Questions and Answers on Individualized Education Program (IEP) Development, The State's Model IEP Form and Related Requirements" Question 8 at pp. 22-23, Office of Special Educ. Mem. [Updated October 2023], available at https://www.nysed.gov/sites/default/files/programs/special-education/questions-answers-iep-development_0.pdf [emphasis added]).  Thus, an IEP is not supposed to assign goals to a particular provider or teacher.

goals contained in the student's April 2022 IEP were appropriate is satisfactorily supported by the hearing record.

### 3.   6:1+1 Special Class

The parents assert that the IHO erred in finding that the district met its burden to establish that the recommendation of a 6:1+1 special class was appropriate for the student as there was an "absence of any description, account, rationalization or details from an educator as to how such a program would meet [the student's] needs, enable him to access the learning material, or permit him to function in the classroom" (Req. for Rev. at pp. 6-8).[16]  The parents argue that the evidence in the hearing record does not support that a 6:1+1 special class could meet the student's needs (id. at p. 8).  Additionally, the parents claim the April 2022 IEP referenced the student's specific need for 1:1 support from a SEIT or related service provider but that the district did not address how the student would succeed within a classroom with five other students without such individual support (id. at p. 6).  While the student's need for individual support was described throughout the present levels of performance, the information relied on to develop the April 2022 IEP was created while the student was in a half-day mainstream private preschool program receiving SEIT, speech-language therapy, OT, and PT with "11 students, two main teachers, and a teaching aide" (Parent Ex. C at p. 2; Dist. Ex. 4 at pp. 1-2).

State regulation indicates that the maximum class size for special classes containing students whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention, shall not exceed six students, with one or more supplementary school personnel assigned to each class during periods of instruction (see 8 NYCRR 200.6[h][4][ii][a]).  Management needs, in turn, are defined by State regulations as "the nature of and degree to which environmental modifications and human material resources are required to enable the student to benefit from instruction" and shall be determined in accordance with the factors identified in the areas of academic or educational achievement and learning characteristics, social, and physical development (8 NYCRR 200.1[ww][3][i][d]).

The April 2022 CSE recommended that the student receive instruction in a 6:1+1 special class placement for all core subjects (Dist. Ex. 1 at p. 20).  In conjunction with the supports inherent to the 6:1+1 special class, the April 2022 IEP included management needs that addressed the student's need for individualized support including small group instruction; an organized work environment for supporting sustained attention; refocusing prompts; direct support to practice learning skills; reminders to complete a routine; repetition of instructions and/or gestures; modeling and prompting of words and combinations of words; frequent opportunities to practice skills; positive reinforcement; visual cues and wait time; physical cues to help the student hold or manipulate materials appropriately; physical cues to guide him to different areas; breaks

---

[16] Although the parents do not allege a lack of evaluative information with respect to the development of the April 2022 IEP, the parents stated that they shared the February 2022 private neuropsychological evaluation with the district, but it was not considered by the CSE (Req. for Rev. at p. 8).  The hearing record was unclear as to whether or not the CSE had the February 2022 neuropsychological evaluation report: the district's answer indicated the April 2022 CSE considered the results of the February 2022 neuropsychological evaluation; however, that information was not included in the April 2022 IEP or the May 2022 prior written notice (Answer at ¶ 11; see Dist. Exs. 1, 2).

throughout the day; break down of skills into smaller steps; modeling, prompting and physical cues to assist with following directions and engaging in play; combining favorite toys with less preferred ones to support attention; and provide structure, routine, and predictability (id. at pp. 9-10). Each of these management needs required some level of direct adult support to implement. The April 2022 IEP indicated that the "management needs should be implemented daily in order for [the student] to make gains" (id. at p. 10). Additionally, the student was recommended for individual related services of OT, PT, and speech-language therapy (id. at p. 20).

The parents claim that the student needed "1:1 adult support at all times" and the district failed to address how the student would be able to "function with five other students in his classroom, without the immediate presence and constant assistance of 1:1 instructional support via a SEIT or SETSS provider" (Req. for Rev. at p. 6). The IHO was correct that the student was not eligible for SEIT services as he was entering kindergarten (see IHO Decision at p. 8). However, full-time 1:1 instructional support (SETSS) in a 6:1+1 special class setting leans toward maximization of a program which is not required by IDEA. Federal and State regulations also require that school districts ensure that a continuum of alternative placements be available to meet the needs of students with disabilities for special education and related services (34 CFR 300.115; 8 NYCRR 200.6). The continuum of alternative placements includes instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions; the continuum also makes provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement (34 CFR 300.115[b]). State regulations do not include 1:1 academic instruction as part of the continuum of services that a CSE could consider (see 8 NYCRR 200.6).

Although the parents may have preferred the delivery of 1:1 instruction and offered the private February 2022 neuropsychological evaluation into evidence as support, for the reasons stated above, review of the April 2022 IEP shows that it was specifically tailored to meet the student's need for individualized support and designed to allow him to make progress within a small, structured classroom setting. Although the February 2022 neuropsychological evaluation identified continuing with a 1:1 instruction from a preschool SEIT as "most appropriate," such 1:1 instruction is not part of the mandated continuum of services that is contemplated for school age services under the IDEA, and even the private evaluator provided alternative recommendations for a "small, structured, full-time special education classroom with a very high teacher to student ratio within a special education school" (Parent Ex. C at p. 12),[17] which is the type of programming recommended by the CSE.

Moreover, based upon the foregoing, and contrary to the parents' argument, the IHO did not shift the burden of proof, and the district met its burden to demonstrate that the 6:1+1 special class, together with the supports and related services described above, was appropriate and offered

---

[17] As noted above, it is unclear if the parents provided the February 2022 evaluation to the CSE, but the ultimate special class recommendation by the CSE is within the range of options identified by the evaluator.

the student a FAPE.[18]   Therefore, the evidence in the hearing record supports the IHO's determination that the April 2022 IEP offered the student a FAPE for the 2022-23 school year.

### C.  Assigned Public School Site

To meet its legal obligations, a district must have an IEP in effect at the beginning of each school year for each child in its jurisdiction with a disability (34 CFR 300.323 [a]; 8 NYCRR 200.4 [e][1][ii]; Cerra, 427 F.3d at 194; K.L. v. New York City Dep't of Educ., 2012 WL 4017822, at *13 [S.D.N.Y. Aug. 23, 2012], aff'd, 530 Fed. App'x 81, 2013 WL 3814669 [2d Cir. July 24, 2013]; B.P. v. New York City Dep't of Educ., 841 F. Supp.2d 605, 614 [E.D.N.Y. 2012]; Tarlowe v. New York City Bd. of Educ., 2008 WL 2736027, at *6 [S.D.N.Y. July 3, 2008] [stating that "[a]n education department's delay does not violate the IDEA so long as the department 'still ha[s] time to find an appropriate placement . . . for the beginning of the school year in September'"], quoting Bettinger v. New York City Bd. of Educ., 2007 WL 4208560, at *8 n.26 [S.D.N.Y. Nov. 20, 2007]).   Thereafter, and once a parent consents to a district's provision of special education services, such services must be provided by the district in conformity with the student's IEP (20 U.S.C. § 1401 [9][D]; 34 CFR 300.17 [d]; see 20 U.S.C. § 1414 [d]; 34 CFR 300.320).   When determining how to implement a student's IEP, the assignment of a particular school is an administrative decision, provided it is made in conformance with the CSE's educational placement recommendation (see M.O. v. New York City Dep't of Educ., 793 F.3d 236, 244-45 [2d Cir. 2015]; K.L.A. v. Windham Southeast Supervisory Union, 371 Fed. App'x 151, 154 [2d Cir. Mar. 30, 2010]; T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 420 [2d Cir. 2009]; White v. Ascension Parish Sch. Bd., 343 F.3d 373, 379 [5th Cir. 2003]; see also Veazey v. Ascension Parish Sch. Bd., 121 Fed. App'x 552, 553 [5th Cir. Jan. 5, 2005]; A.W. v. Fairfax Co. Sch. Bd., 372 F.3d 674, 682 [4th Cir. 2004]; Concerned Parents & Citizens for the Continuing Educ. at Malcolm X Pub. Sch. 79 v. New York City Bd. of Educ., 629 F.2d 751, 756 [2d Cir. 1980]; Tarlowe, 2008 WL 2736027, at *6; Placements, 71 Fed. Reg. 46588 [Aug. 14, 2006]).   There is no requirement in the IDEA that an IEP name a specific school location (see, e.g., T.Y., 584 F.3d at 420).

#### 1.  Assigned School Tour

The parents claim that they were denied meaningful participation in the development of the student's IEP by not having the opportunity to tour the recommended assigned school site.   The district does not address this particular claim in its answer.

While parents are entitled to participate in the determination of the type of placement their child will attend, the IDEA confers no rights on parents with regard to school site selection (C.F. v. New York City Dep't of Educ., 746 F.3d 68, 79 [2d Cir. Mar. 4, 2014]; see Luo v. Baldwin Union Free Sch. Dist., 2013 WL 1182232, at *5 [E.D.N.Y. Mar. 21, 2013], aff'd, 556 Fed. App'x 1 [2d Cir Dec. 23, 2013]; J.L. v. City Sch. Dist. of New York, 2013 WL 625064, at *10 [S.D.N.Y. Feb. 20, 2013]; see also R.E., 694 F.3d at 191–92 [finding that a district may select a specific public school site without the advice of the parents]; F.L. v. New York City Dep't of Educ., 2012

---

[18] In this matter, the IHO correctly identified the legal standards applicable to the burdens of proof with respect to the parties (IHO Decision at pp. 4-5).  The IHO discussed both the procedural and substantive challenges raised by the parents to the IEP and found in both instances that the district met its burden of proof (id. at pp. 5-10).

WL 4891748, at *11 [S.D.N.Y. Oct. 16, 2012] [noting that parents are not procedurally entitled to participate in decisions regarding public school site selection], aff'd, 553 Fed. App'x 2 [2d Cir. Jan. 8, 2014]).

Regarding the parents' ability to tour an assigned public school site, the United States Department of Education's Office of Special Education Programs (OSEP) has opined that the IDEA does not provide a general entitlement to parents of students with disabilities or their professional representatives to observe proposed school placement options for their children (Letter to Mamas, 42 IDELR 10 [OSEP 2004]; see G.J. v. Muscogee County Sch. Dist., 668 F.3d 1258, 1267 [11th Cir. 2012] [noting that rather than forbidding or mandating access for parents, "the process contemplates cooperation between parents and school administrators"]; J.B. v. New York City Dep't of Educ., 242 F. Supp. 3d 186, 195 [E.D.N.Y. 2017] [noting that the IDEA does not afford parents a right to visit an assigned school placement before the recommendation is finalized]; J.C. v. New York City Dep't of Educ., 2015 WL 1499389, at *24 n.14 [S.D.N.Y. Mar. 31, 2015] [acknowledging that courts have rejected the argument that parents have a right under the IDEA to visit assigned schools and listing authority], aff'd, 643 Fed. App'x 31 [2d Cir. Mar. 16, 2016]; E.A.M. v. New York City Dep't of Educ., 2012 WL 4571794, at *11 [S.D.N.Y. Sept. 29, 2012] [finding that a district has no obligation to allow a parent to visit an assigned school or proposed classroom before the recommendation is finalized or prior to the school year]; S.F. v. New York City Dep't of Educ., 2011 WL 5419847, at *12 [S.D.N.Y. Nov. 9, 2011] [same]).[19]

On the other hand, there is district court authority indicating that a parent has a right to obtain information about an assigned public school site (see H.L. v. New York City Dep't of Educ., 2019 WL 181307, at *9 [S.D.N.Y. Jan. 11, 2019] [noting that "[i]n light of M.O., courts have found that parents have the right to obtain timely and relevant information regarding school placement, in order to evaluate whether the IEP can be implemented at the proposed location"]; F.B. v New York City Dep't of Educ., 2015 WL 5564446, at *11-*18 [S.D.N.Y. Sept. 21, 2015] [finding that the parents "had at least a procedural right to inquire whether the proposed school location had the resources set forth in the IEP"]; V.S. v New York City Dep't of Educ., 25 F. Supp. 3d 295, 299-301 [E.D.N.Y. 2014] [finding that the "parent's right to meaningfully participate in the school selection process" should be considered rather than the "parent's right to determine the actual school selection"]; C.U. v. New York City Dep't of Educ., 2014 WL 2207997, at *14-*16 [S.D.N.Y. May 27, 2014] [holding that "parents have the procedural right to evaluate the school assignment" and "acquire relevant information about" it]).

In his direct affidavit testimony, the student's father testified that upon receipt of the prior written notice of recommendation (May 18, 2022) and school location letter (June 22, 2022) he "immediately reached out" to the district via email and asked to schedule a visit of the assigned school (Parent Ex. K ¶ 6; see Dist. Exs. 2-3). The student's father testified that on June 28, 2022, a district administrator responded to him stating that an administrator from the assigned school would "reach out" to discuss the school placement (Parent Ex. K ¶ 6). Further, he testified that on

---

[19] Nothing in this decision is intended to discourage districts from offering parents the opportunity to view school or classroom placements, as such opportunities can only foster the collaborative process between parents and districts envisioned by Congress as the "core of the [IDEA]" (Schaffer v. Weast, 546 U.S. 49, 53 [2005], citing Rowley, 458 U.S. at 205-06; see also 20 U.S.C. § 1400[c][5]).

August 8, 2022 a coordinator from the assigned school reached out to schedule a tour and inquired about the parents' availability to conduct the same (id.). Thereafter, according to the student's father, the same coordinator again contacted him on August 12, 2022 asking the parents to come to the school that particular day (id.). The parents were unable to attend the school visit due to the short notice and requested other available dates (id.). Further, according to the direct testimony of the student's father, the coordinator stated that school would be in session in September 2022 and to arrange for a tour at that time (id.). The student's father stated that on August 31, 2022, he again reached out to the coordinator for dates to visit the school in September but failed to receive any response (id.).

As discussed above, the district is not required to allow a parent to visit an assigned school (see J.B., 242 F. Supp. 3d at 195; J.C., 2015 WL 1499389, at *24 n.14; E.A.M., 2012 WL 4571794, at *11; S.F., 2011 WL 5419847, at *12). However, while a general entitlement to visit an assigned school is not supported by the relevant legal authority, there is some authority that a district's failure to accommodate a parents' inquiries concerning an assigned school could, under certain circumstances, constitute a procedural violation that could either contribute to a finding that FAPE was denied to a student or in itself rise to the level of a FAPE denial. Such circumstances, however, are not present here. While the evidence in the hearing record supports a finding that there were some minor difficulties in arranging for a visit to the assigned school and a school visit ultimately was not scheduled, the district did provide the parents with information pertaining to how to contact the school and arrange for a visit and did not ignore the parents' requests to visit the school or refuse to allow a school visit. Moreover, while a parent need not particularize his or her questions and concerns in order to justify a request to learn about an assigned school, it does not appear in this instance that the parents sought any information regarding the assigned school let alone any information that would have demonstrated the school's inability to implement the IEP. Accordingly, the parents' argument that the IHO should also have found that the district denied the student a FAPE on the ground that the parents were not able to visit the assigned school must fail.

## 2. Implementation of April 2022 IEP

In furtherance of their argument that the assigned school could not implement the IEP, the parents argue that the IHO erred in determining that the parents' claim regarding IEP implementation was speculative (Req. for Rev. at p. 9). The parents argue that the IHO failed to address the substance of their claim that the recommended services "exceeded the number of hours in a school week" (id.). The parents more particularly detail their claim explaining that "the IEP mandated 35 periods per week of 6:1+1 'core' special education instruction plus 8 sessions of related services per week" and the district did "not demonstrate that this mandate of 43 periods and sessions, along with 5 periods of lunch, could be implemented in accordance with legal restrictions regarding the number of hours in a school week" (id.). The district argues that the parents' implementation claim was "pure speculation" and insufficient to support the parents' claim for a denial of FAPE (Answer ¶ 13).

The IHO found that since the student did not attend the recommended district program, any "conclusion that the [district] could not implement [the student's] IEP [wa]s speculative" (IHO Decision at p. 9). The IHO stated that the parents' claim must be based upon more than their

"personal belief" that the assigned school was not appropriate, and the parents did not provide a basis on which to "reject" the program (id. at p. 10).

The Second Circuit has explained that "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement" (R.E., 694 F.3d at 195; see E.H. v. New York City Dep't of Educ., 611 Fed. App'x 728, 731 [2d Cir. May 8, 2015]; R.B. v. New York City Dep't of Educ., 603 Fed. App'x 36, 40 [2d Cir. Mar. 19, 2015] ["declining to entertain the parents' speculation that the 'bricks-and-mortar' institution to which their son was assigned would have been unable to implement his IEP"], quoting T.Y., 584 F.3d at 419; R.B. v. New York City Dep't of Educ., 589 Fed. App'x 572, 576 [2d Cir. Oct. 29, 2014]). However, a district's assignment of a student to a particular public school site must be made in conformance with the CSE's educational placement recommendation, and the district is not permitted to deviate from the provisions set forth in the IEP (M.O., 793 F.3d at 244; R.E., 694 F.3d at 191-92; T.Y., 584 F.3d at 419-20; see C.F., 746 F.3d at 79). The Second Circuit has held that claims regarding an assigned school's ability to implement an IEP may not be speculative when they consist of "prospective challenges to [the assigned school's] capacity to provide the services mandated by the IEP" (M.O., 793 F.3d at 245; see Y.F. v. New York City Dep't of Educ., 659 Fed. App'x 3, 5-6 [2d Cir. Aug. 24, 2016]; J.C. v. New York City Dep't of Educ., 643 Fed. App'x 31, 33 [2d Cir. Mar. 16, 2016]; B.P. v. New York City Dep't of Educ., 634 Fed. App'x 845, 847-49 [2d Cir. Dec. 30, 2015]). Such challenges must be "tethered" to actual mandates in the student's IEP (see Y.F., 659 Fed. App'x at 5). Additionally, the Second Circuit indicated that such challenges are only appropriate if they are evaluated prospectively (as of the time the parent made the placement decision) and if they were based on more than "mere speculation" that the school would not adequately adhere to the IEP despite its ability to do so (M.O., 793 F.3d at 244). In order for such challenges to be based on more than speculation, a parent must allege that the school is "factually incapable" of implementing the IEP (see M.E. v. New York City Dep't of Educ., 2018 WL 582601, at *12 [S.D.N.Y. Jan. 26, 2018]; Z.C. v. New York City Dep't of Educ., 2016 WL 7410783, at *9 [S.D.N.Y. Nov. 28, 2016]; L.B. v. New York City Dept. of Educ., 2016 WL 5404654, at *25 [S.D.N.Y. Sept. 27, 2016]; G.S. v. New York City Dep't of Educ., 2016 WL 5107039, at *15 [S.D.N.Y. Sept. 19, 2016]; M.T. v. New York City Dep't of Educ., 2016 WL 1267794, at *14 [S.D.N.Y. Mar. 29, 2016]). Such challenges must be based on something more than the parent's speculative "personal belief" that the assigned public school site was not appropriate (K.F. v. New York City Dep't of Educ., 2016 WL 3981370, at *13 [S.D.N.Y. Mar. 31, 2016]; Q.W.H. v. New York City Dep't of Educ., 2016 WL 916422, at *9 [S.D.N.Y. Mar. 7, 2016]; N.K. v. New York City Dep't of Educ., 2016 WL 590234, at *7 [S.D.N.Y. Feb. 11, 2016]).

The April 2022 IEP included a special class recommendation noting a frequency and duration of 35 periods per week (Dist. Ex. 1 at p. 20).[20] Additionally, the April 2022 IEP included recommendations for related services totaling four hours per week with each related service session being 30 minutes in duration (id.). Each of the related services recommendations indicated that they were to be provided in a "[s]eparate [l]ocation [p]rovider's space" (id.).

The parents' claims regarding the provision of the special class and related services to the student is not borne out by the evidence, as the student never attended the assigned public school

---

[20] There is no evidence in the hearing record as to the length of a period.

site pursuant to the April 2022 IEP.  Any conclusion that the district would not have implemented the student's IEP or that the assigned public school site could not meet the student's needs would necessarily be based on impermissible speculation, and the district was not obligated to present retrospective evidence at the impartial hearing regarding the execution of the student's programming under the IEP or to refute the parents' claims (R.B. v. New York City Dep't of Educ., 589 Fed. App'x 572, 576 [2d Cir. Oct. 29, 2014]; F.L. v. New York City Dep't of Educ., 553 Fed. App'x 2, 9 [2d Cir. Jan. 8, 2014]; K.L. v. New York City Dep't of Educ., 530 Fed. App'x 81, 87 [2d Cir. July 24, 2013]; R.E., 694 F.3d at 187 & n.3]).  Further, any claim that the recommended educational program would not have been able to be implemented without a recommendation for an extended school day is really a "substantive attack[] on [the] IEP . . . couched as [a] challenge[] to the adequacy" of the assigned public school site's capacity to implement the IEP (M.O. v. New York City Dep't of Educ., 793 F.3d 244, 245 [2d Cir. 2015]).  In view of the foregoing, the parents cannot prevail on their claims regarding implementation of the program recommended in the April 2022 IEP.

## VII. Conclusion

Having determined that the evidence in the hearing record supports the IHO's determination that the district offered the student a FAPE for the 2022-23 school year, the necessary inquiry is at an end and there is no need to reach the issues of whether Shirley Aninias was an appropriate unilateral placement or whether equitable considerations weighed in favor of the parents' request for relief.

I have considered the remaining contentions and find it is unnecessary to address them in light of my determinations above.

**THE APPEAL IS DISMISSED.**


Dated:        **Albany, New York**
              **February 20, 2024**        _____
                                           **JUSTYN P. BATES**
                                           **STATE REVIEW OFFICER**